Case No. 25-693

In the United States Court of Appeals
for the Ninth Circuit

ADAM RICHARDS, et al.,
*Plaintiffs-Appellants,*

v.

GAVIN NEWSOM,
in his official capacity as Governor of the State of California,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Central District of California
Case No. 8:23-cv-02413 JVS (KESx)

**APPELLANTS' OPENING BRIEF**

C.D. Michel                          Donald Kilmer
Anna M. Barvir                       Law Offices of Donald Kilmer, APC
MICHEL & ASSOCIATES, P.C.            14085 Silver Ridge Rd.
180 E. Ocean Blvd., Suite 200        Caldwell, Idaho 83607
Long Beach, CA 90802                 (408) 264-8489
(562) 216-4444                       don@dklawoffice.com
cmichel@michellawyers.com

*Attorneys for Plaintiffs-Appellants*

May 27, 2025

## CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1(a) of the Federal Rules of Appellate Procedure, counsel for Plaintiffs-Appellants make these disclosures:

### ON TARGET INDOOR SHOOTING RANGE, LLC

On Target Indoor Shooting Range, LLC, is not a publicly held corporation, does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

### GAALSWYK ENTERPRISES, INC. (D/B/A SMOKIN' BARREL FIREARMS)

Gaalswyk Enterprises, Inc. (D/B/A Smokin' Barrel Firearms) is not a publicly held corporation, does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

### GUN OWNERS OF CALIFORNIA, INC.

Gun Owners of California, Inc. ("GOC") is a nonprofit organization. GOC is not a publicly held corporation, does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

### GUN OWNERS OF AMERICA, INC.

Gun Owners of America, Inc. ("GOA") is a nonprofit organization. GOC is not a publicly held corporation, does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

### GUN OWNERS FOUNDATION

Gun Owners Foundation ("GOF") is a nonprofit organization. GOC is not a publicly held corporation, does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

### CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED

California Rifle & Pistol Association, Incorporated ("CRPA"), is a nonprofit - organization. CRPA is not a publicly held corporation, does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

### SECOND AMENDMENT FOUNDATION

The Second Amendment Foundation ("SAF") is a nonprofit organization. SAF is not a publicly held corporation, does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

Dated: May 27, 2025                    **MICHEL & ASSOCIATES, P.C.**

                                       s/ Anna M. Barvir
                                       _____
                                       Anna M. Barvir
                                       *Attorneys for Plaintiffs-Appellants Adam*
                                       *Richards, Jeffrey Vandermeulen, Gerald Clark,*
                                       *Jesse Harris, On Target Indoor Shooting Range,*
                                       *LLC, Gaalswyk Enterprises, Inc. (D/B/A/*
                                       *Smokin' Barrel Firearms), Gun Owners of*
                                       *California, Inc., Gun Owners of America,*
                                       *Inc., Gun Owners Foundation, and California Rifle*
                                       *& Pistol Association, Incorporated*

Dated: May 27, 2025                    **LAW OFFICES OF DONALD KILMER, APC.**

                                       s/ Donald Kilmer
                                       _____
                                       Donald Kilmer
                                       *Attorney for Plaintiff-Appellant Second*
                                       *Amendment Foundation*

ii

# TABLE OF CONTENTS

Page

Corporate Disclosure Statement.................................................................. i

Table of Contents.................................................................................... iii

Table of Authorities ................................................................................ v

Jurisdictional Statement ......................................................................... 1

Statement Regarding Addendum .............................................................. 1

Statement of the Issues Presented............................................................ 1

Statement of the Case ............................................................................. 2

I.   Factual Background .......................................................................... 2

II.  Procedural History and the Decision on Appeal ................................. 4

Summary of Argument ............................................................................ 8

Argument................................................................................................ 12

I.   Standard of Review .......................................................................... 12

II.  Section 26806 Violates the Fourth Amendment Right to Be Free from
     Unreasonable Searches .................................................................... 13

     A.  The Search Occurs at the Moment of Compelled Recording.......... 14

     B.  The "Closely Regulated Industry" Exception Does Not Justify Constant
         Mass Surveillance ....................................................................... 18

         1.  Section 26806 mandates mass investigatory surveillance, not
             traditional regulatory inspection............................................. 19

         2.  Section 26806 fails all three prongs of the Burger test ........... 20

     C.  The Overbreadth of Section 26806 Is an Especially Serious Violation of
         the Fourth Amendment Rights of Home-based FFLs.................... 22

III.   Section 26806 Effects an Uncompensated Taking Under the Fifth
       Amendment .................................................................................. 24

       A.   Section 26806 Constitutes a Per Se Physical Taking ................... 25

       B.   Section 26806 Also Effects a Regulatory Taking Under *Penn Central*.......... 29

IV.    Section 26806 Violates the First Amendment Rights to Free Speech and
       Assembly .................................................................................... 32

       A.   The Pervasive Surveillance of a Constitutionally Protected Industry
            Objectively Chills the Freedoms of Speech and Association ..................... 33

            1.   Section 26806 chills protected speech.................................... 35

            2.   Section 26806 chills the freedom of assembly. ..................... 42

       B.   Section 26806 Violates the Longstanding Right to Anonymous Speech.... 45

       C.   Section 26806 Is Hopelessly Overbroad ........................................ 46

Conclusion.......................................................................................... 48

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*281 Care Comm. v. Arneson,*
  638 F.3d 621 (8th Cir. 2011).................................................................. 46

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents,*
  824 F.3d 858 (9th Cir. 2016)............................................................34, 36

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)............................................................................ 12

*Bates v. City of Little Rock,*
  361 U.S. 516 (1960)............................................................................ 43

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)............................................................................ 12

*Blout v. Rizzi,*
  400 U.S. 410 (1971)............................................................................ 37

*Boise Cascade Corp. v. United States,*
  296 F.3d 1339 .................................................................................... 27

*Broadrick v. Okla.,*
  413 U.S. 601 (1973)............................................................................ 48

*Brunette v. Humane Soc'y of Ventura Cnty.,*
  294 F.3d 1205 (9th Cir. 2002)............................................................. 16

*Cal. Hous. Sec., Inc. v. United States,*
  959 F.2d 955 (Fed. Cir. 1992)............................................................. 26

*Carpenter v. United States,*
  585 U.S. 296 (2018)................................................................... passim

*Cedar Point Nursery v. Hassid,*
  594 U.S. 139 (2021).................................................... 25, 26, 28, 29

*Chicago, B. & Q. R.R. Co. v. City of Chicago,*
  166 U.S. 226 (1897)............................................................................ 24

*City of Los Angeles v. Patel,*
  576 U.S. 409 (2015)............................................................................ 18

*Doe v. 2TheMart.com Inc.*,
   140 F. Supp. 2d 1088 (W.D. Wash. 2001) ........................................... 45, 46

*Doe v. Bonta*,
   101 F.4th 633 (9th Cir. 2024) .............................................................. 23

*Florida v. Jardines*,
   569 U.S. 1 (2013) ................................................................................. 23

*Garcia v. City of Trenton*,
   348 F.3d 726 (8th Cir. 2003) .............................................................. 37

*Green v. Miss USA, LLC*,
   52 F.4th 773 (9th Cir. 2022) ............................................................... 47, 48

*Healy v. James*,
   408 U.S. 169 (1972) ............................................................................ 43

*Hendler v. United States*,
   952 F.2d 1364 (Fed. Cir. 1991) .......................................................... 27

*Horne v. Dep't of Agric.*,
   576 U.S. 350 (2015) ............................................................................ 24

*Katz v. United States*,
   389 U.S. 347 (1967) ............................................................................ 14

*Kaur v. Md.*,
   141 S. Ct. 5 (2020) ............................................................................. 17

*Loretto v. Teleprompter Manhattan CATV Corp.*,
   458 U.S. 419 (1982) ...........................................................24, 25, 26

*Marshall v. Barlow's, Inc.*,
   436 U.S. 307 (1978) ............................................................................ 18, 21

*McIntyre v. Ohio Elections Comm'n*,
   514 U.S. 334 (1995) ............................................................................ 45, 46

*Minneapolis Branch of the NAACP v. City of Minneapolis*,
   2024 U.S. Dist. LEXIS 81602 (D. Minn. Mar. 29, 2024) ........................... 34

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
   597 U.S. 1 (2022) ............................................................................... 18, 27

*NAACP v. Alabama ex rel. Patterson*,
   357 U.S. 449 (1958) ............................................................................ 42, 44

*New York v. Burger,*
    482 U.S. 691 (1987) ................................................................. passim

*Penn Cent. Transp. Co. v. New York City,*
    438 U.S. 104 (1978) ..................................................................... 8, 29

*Presbyterian Church (USA) v. United States,*
    870 F.2d 518 (9th Cir. 1989) ............................................................. 37

*Rush v. Obledo,*
    756 F.2d 713 (9th Cir. 1985) .......................................... 7, 23, 24, 45

*Shelton v. Tucker,*
    364 U.S. 479 (1960) ........................................................................ 44

*Simmons v. United States,*
    390 U.S. 377 (1968) ........................................................................ 16

*Tahoe-Sierra Preserv. v. Tahoe Reg'l Plan. Agency,*
    535 U.S. 302 (2002) ........................................................................ 28

*Tex. Ass'n of Money Servs. Bus. v. Bondi,*
    Case No. 25-cv-00344 (W.D. Tex. May 19, 2025) ...................... 49

*United Furniture Workers v. Gates,*
    75 F. Supp. 620 (N.D. Ind. 1948) ............................................... 42

*United States v. Attson,*
    900 F.2d 1427 (9th Cir. 1990) ..................................................... 16

*United States v. Biswell,*
    406 U.S. 311 (1972) .................................................................. 18, 19

*United States v. Jones,*
    565 U.S. 400 (2012) ............................................................. 14, 15, 34

*United States v. Lucero,*
    989 F.3d 1088 (9th Cir. 2021) ..................................................... 39

*United States v. United Foods,*
    533 U.S. 405 (2001) ........................................................................ 46

*Vess v. Ciba-Geigy Corp. USA,*
    317 F.3d 1097 (9th Cir. 2003) ..................................................... 12

*Virginia v. Hicks,*
    539 U.S. 113 (2003) ........................................................................ 47

*White v. Davis,*
    13 Cal.3d 757 (1975) ................................................................34, 42

**Constitutional Provisions**

U.S. Const. amend. I .............................................................................passim

U.S. Const. amend. II............................................................................passim

U.S. Const. amend. IV...........................................................................passim

U.S. Const. amend. V.............................................................................passim

U.S. Const. amend. XIV ............................................................................ 4

**Statutes**

28 U.S.C. § 1291 ....................................................................................... 1

28 U.S.C. § 1331 ....................................................................................... 1

28 U.S.C. § 1343 ....................................................................................... 1

42 U.S.C. § 1983 ....................................................................................... 1

Cal. Penal Code §§ 26700-27140 ............................................................. 9

Cal. Penal Code § 26806 ..................................................................passim

**Rules**

Fed. R. App. Proc. 3................................................................................. 1

Fed. R. App. Proc. 4................................................................................. 1

Fed. R. Civ. Proc. 12 .......................................................................5, 7, 12

Fed. R. Civ. Proc. 65 ................................................................................ 4

Ninth Cir. R. 3-1 ...................................................................................... 1

Ninth Cir. R. 3-2 ...................................................................................... 1

**Other Authorities**

Kerr, Orin S., *The Two Tests of Search Law: What Is the Jones Test, and What Does That Say About Katz?*, Wash. Univ. L. Rev. (forthcoming 2025), available at
    https://ssrn.com/abstract=5129549 ......................................................... 13

Defendants' Notice of Motion & Motion to Dismiss Amended Complaint, *Richards v. Newsom*, 2024 WL 4812537 (C.D. Cal. Oct. 16, 2024), ECF No. 41 ................... 22, 47

Memorandum of Points & Authorities in Support of Plaintiffs' Application for Temporary Restraining Order, *Richards v. Newsom*, 2024 WL 1600659 (C.D. Cal. Mar. 1, 2024) (No. 23-cv-02413), ECF No. 11-1 ........................................... 18

S. B. 1384, 2021-2022 Reg. Sess. (Cal. 2022) ..................................................... 2

Scalia, Antonin & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .......................................................................................................... 40

## JURISDICTIONAL STATEMENT

Because this suit arises under the Constitution and laws of the United States, the district court had original jurisdiction under 28 U.S.C. § 1331. 2-ER-247-48. And because this is a 42 U.S.C. § 1983 action, brought to redress the deprivation of constitutional rights under the color of law, the lower court also had jurisdiction under 28 U.S.C. § 1343(a)(3). 2-ER-247-48.

After granting Defendants-Appellees' motion to dismiss the complaint, the district court entered judgment for Defendants-Appellees on January 28, 2025. 1-ER-2. Appellants filed a timely notice of appeal on January 31, 2025, 4-ER-628-32, under Federal Rules of Appellate Procedure 3 and 4 and Ninth Circuit Rules 3-1–3-2.

Under 28 U.S.C. § 1291, this Court has jurisdiction over this appeal of the final judgment of the Central District of California.

## STATEMENT REGARDING ADDENDUM

An addendum reproducing relevant constitutional and statutory provisions is bound with this brief.

## STATEMENT OF THE ISSUES PRESENTED

1.      Does a warrantless government mandate that firearm dealers collect audiovisual recordings of people engaged in constitutionally protected activity at all hours of every day and store and maintain that data for government inspection on demand, constitute an unreasonable search in violation of the Fourth Amendment?

2.      Does a law that compels firearm dealers to install, operate, and maintain surveillance infrastructure for the government's exclusive benefit, at substantial expense, and appropriates private property for continuous data collection without compensation constitute an unlawful taking under the Fifth Amendment?

1

3.  Does a law requiring firearm dealers to continuously record audiovisual surveillance of their premises, including conversations in private homes, violate the First Amendment by chilling protected speech, deterring political association, and eliminating anonymity in expressive activity?

## STATEMENT OF THE CASE

### I.  FACTUAL BACKGROUND

On September 30, 2022, California Governor Gavin Newsom signed Senate Bill 1384 (Min), adding Section 26806 to the California Penal Code. S. B. 1384, 2021-2022 Reg. Sess. (Cal. 2022). The law took effect on January 1, 2024. 1-ER-4; *see also* Cal. Penal Code § 26806(a).

The law requires all California firearm dealers, including those who operate from their homes, to install "a digital video surveillance system" on their business premises. Cal. Penal Code § 26806(a) (the full text of the challenged statute can be found on pages A3-A4 of the Addendum). Among other minimum standards, the system must include "permanently mounted [cameras] in a fixed location" that "continuously record 24 hours per day." *Id.* § 26806(a)(2), (4). Areas that must be recorded in this manner include: (1) "[i]nterior views of all entries and exits," *id.* § 26806(a)(3)(A); (2) "[a]ll areas where firearms are displayed," *id.* § 26806(a)(3)(b); and (3) "[a]ll points of sale, sufficient to identify the parties involved in the transaction," *id.* § 26806(a)(3(C). The cameras must "clearly record images and, for systems located inside the premises, audio, of the area under surveillance" to "allow for the clear identification of any person." *Id.* § 26806(a)(1)-(2).

The recordings must be stored by the licensee for at least one year and made available to government officials for inspection, which may occur without notice or

2

limit. *Id.* § 26806(a)(6), (b)(1). Dealers are also required to display conspicuous warnings to customers and guests that they are being recorded, stating:

> THESE PREMISES ARE UNDER VIDEO AND AUDIO SURVEILLANCE. YOUR IMAGE AND CONVERSATIONS MAY BE RECORDED.

*Id.* § 26806(c).

Private firearm dealers must assume the full financial burden of implementing this state-mandated surveillance infrastructure, including installation, maintenance, data storage, and other costs. Compliance is estimated to cost ordinary gun stores over $17,000, not including sales tax, shipping, or the costs of ongoing maintenance or replacement of old or faulty systems. 2-ER-300-05. Even though firearm dealers must assume all the costs of the State's surveillance regime, they are forbidden to "use, share, allow access, or otherwise release recordings" except: (1) to a government agent conducting an inspection of the licensee's premises to ensure compliance with the law, but "only if a warrant or court order would not generally be required for that access"; or (2) "pursuant to search *warrant* or other court order"; or (3) in response to an insurance claim or as part of a civil discovery process. Cal. Penal Code § 26806(b).

Appellants include individual firearm dealers, civil rights and public interest organizations, and private citizens engaged in constitutionally protected speech, association, and commerce. 2-ER-248-55. Some are "kitchen-table" FFLs—home-based dealers who conduct sales from their private residences. 2-ER-248-49; 3-ER-385-87, 404-06. These plaintiffs face direct harm from Section 26806's intrusion into their homes, including the forced recording of intimate family conversations, religious practices, medical conditions, political discussions, and routine domestic life. 2-ER-248-49; 3-ER-385-87, 404-06. They must either comply with warrantless, around-the-

clock government-directed surveillance of their homes or exit the firearms industry altogether.

Other plaintiffs include individuals and organizations with members who have been chilled from engaging in constitutionally protected activities while visiting these newly surveilled FFLs. 2-ER-249-55. For instance, Appellant Gerald Clark stopped attending and organizing events at gun stores for fear that his political conversations would be captured and stored at the government's direction. 2-ER-249-50. Similarly, Appellant Jesse Harris curtailed his advocacy out of concern that his speech would be recorded or that his affiliations would be exposed to hostile government actors. 2-ER-250-51.

## II.  PROCEDURAL HISTORY AND THE DECISION ON APPEAL

Appellants sued in the Central District of California. 4-ER-633. They challenged the law as a violation of the First Amendment rights to free speech and assembly, 2-ER-264-81, 311-12, the Fourth Amendment right to be free from unreasonable searches and seizures, 2-ER-292-305, 314-16, and the Fifth Amendment right to be free from property takings without just compensation, as incorporated against the states via the Fourteenth Amendment, 2-ER-281-92, 312-14.

Appellants immediately filed an ex parte application for a temporary restraining order and a preliminary injunction. 4-ER-657. Without explanation, the district court denied the application for a temporary restraining order but ordered the State to show cause as to "why an order should not be issued pursuant to Rule 65 of the Federal Rules of Civil Procedure enjoining" the enforcement of Section 26806 "during the pendency of th[e] action." 4-ER-654-55. After the preliminary injunction motion was

briefed and argued, the court ordered supplemental briefing on the applicability of Section 26806 to "kitchen table firearm transactions and gun show transactions." 4-ER-652. Then, on March 1, 2024, the court denied the request for preliminary injunctive relief. 3-ER-322; 4-ER-651. The State subsequently moved to dismiss the entire complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, and Appellants responded by amending their complaint. 4-ER-648-49, 651. In August 2024, the State filed a renewed motion to dismiss the amended complaint. 4-ER-648.

On October 16, 2024, the district court granted the State's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) holding that, based on the court's "experience and common sense," Plaintiffs failed to state any plausible constitutional claim. 1-ER-7-8. The court reasoned that not even those forced to install cameras inside their own homes—and perpetually operate them on behalf of the State, all at their own cost—can so much as "state a claim upon which relief can be granted." 1-ER-7.

As to the First Amendment, the court held that Plaintiffs had standing to challenge Section 26806, agreeing that "the threat of chilling speech and loss of membership is a specific and 'well-founded' threat of future harm to satisfy standing." 1-ER-9. Even so, the court dismissed the claim, holding that Plaintiffs had not alleged any First Amendment injury whatsoever.

Rather, the district court held that Plaintiffs failed to demonstrate an "objective fear" of speech-related harm and found their allegations of chilled speech to be merely speculative. 1-ER-10. In support of that conclusion, the court reframed the inquiry to require an objective fear of *retaliation*, rather than a c*hilling effect*, and construed the statute as "strictly prohibit[ing]" government (mis)use of surveillance,

despite the stark absence of such limitations in the statutory text. 1-ER-11. The district court discounted the State's admission that Section 26806 would chill at least *some* speech—specifically speech associated with illicit straw purchases—demurring that such deterrence is irrelevant because "unlawful speech … is not relevant to the inquiry of whether protected activity is being chilled." 1-ER-11. Finally, the court denied that "at-home FFLs would be subject to 24/7 speech surveillance inside their protected homes," while conceding that Section 26806 requires the audiovisual surveillance of multiple indoor locations with those homes. 1-ER-12. The district court theorized that "to the extent that an individual chooses to sell firearms in a location where they may engage in other protected activities, such is the sacrifice they choose to make dealing in the industry." 1-ER-12.

On the freedom of assembly claim, the district court similarly concluded that Plaintiffs failed to allege any constitutional harm. 1-ER-12-14. It emphasized that Section 26806 does not require the disclosure of organizational membership lists to the government and reasoned that the lack of an affirmative demand "of the identities of individuals who belong to an organization or association" precluded a plausible First Amendment violation. 1-ER-13-14. The court did not address Plaintiffs' allegations that real-time surveillance of in-person political engagement chills associational activity. 1-ER-12-14.

The district court then dispensed with Plaintiffs' anonymous-speech argument, finding that commercial firearm dealing is already a highly regulated industry. 1-ER-14-16. As the court reasoned, "Section 26806 is simply another facet of the comprehensive regulatory scheme," and additional monitoring is simply par for the course. 1-ER-15. Rejecting Plaintiffs' references to the historical value of anonymous

6

speech, the district court declared that Plaintiffs' speech neither "encourage[s] the marketplace of ideas" nor "foster[s] open communication and robust debate." 1-ER-15-16. The court also rejected Plaintiffs' overbreadth challenge concluding, without further analysis, that "Section 26806 is entirely devoid of any regulation of speech" and therefore could not be overbroad under the First Amendment. 1-ER-17.

Rejecting Plaintiffs' Fourth Amendment claim, the district court observed that commercial firearm dealing has been recognized as a "closely regulated industry" where "no reasonable expectation of privacy … could exist for a proprietor over the stock of such an enterprise." 1-ER-18. Even so, the district court acknowledged that not all warrantless searches of "closely regulated industries" are reasonable under the Fourth Amendment. Applying the three-element reasonableness test from *New York v. Burger*, 482 U.S. 691 (1987), the court made findings as part of a Rule 12(b)(6) motion that Section 26806 satisfied all elements, and so Plaintiffs "failed to allege a plausible claim that the warrantless searches violate the Fourth Amendment as an unreasonable search." 1-ER-21.

Next, the district court rejected Plaintiffs' Fourth Amendment overbreadth claim, holding that "Plaintiffs' attempt to distinguish at-home from brick-and-mortar shops … [is] unavailing."1-ER-23. The district court distinguished this Court's decision in *Rush v. Obledo*, 756 F.2d 713 (9th Cir. 1985), which invalidated the 24/7 warrantless inspections of at-home daycare providers. Finding that "Section 26806 does not risk crossing into the private domain of at-home FFLs," the district court cited existing limitations on DOJ inspection hours to suggest that the only "searches" at issue are those of the occasional compliance inspector. 1-ER-22. Thus, the district court saw no overbreadth issue for at-home FFLs—implicitly rejecting Plaintiffs'

7

argument that 24/7 warrantless electronic collection and audio-video surveillance itself is what constitutes a "search" for Fourth Amendment purposes.

Finally, the district court rejected Plaintiffs' government-actor argument, concluding that, even if "FFLs are government actors under [Section] 26806, the statute's requirements would still fit neatly within the confines of the Fourth Amendment." 1-ER-23. By focusing only on the Plaintiffs' status as a regulated industry, the district court dismissed the Fourth Amendment claims. The court did not address Plaintiffs' trespassory arguments under the Supreme Court's alternative property-rights approach, failing to engage with those precedents altogether.

The district court also dismissed Plaintiffs' Takings claim. Again asserting that Plaintiffs operate in a "closely regulated industry," the district court first ruled that "Plaintiffs have failed to allege a plausible per se takings claim." 1-ER-24. Then, proceeding to the Plaintiffs' regulatory-taking argument, the district court applied *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978) to balance away Plaintiffs' Fifth Amendment claim.

Having rejected each of the constitutional claims, the district court dismissed the First Amended Complaint with leave to amend. 1-ER-28. Plaintiffs elected to stand on their complaint, and the court entered final judgment on January 28, 2025. 1-ER-2. Plaintiffs timely appealed. 4-ER-628-32.

## SUMMARY OF ARGUMENT

In January 2024, California implemented a mass surveillance regime designed to catalog the faces, conversations, and shopping habits of millions of Californians engaged in constitutionally protected conduct. This audiovisual recording scheme operates 24 hours a day, 7 days a week, and 365 days a year. The private citizens and

businesses commanded to implement this system on California's behalf bear all the costs of constructing the State's new Panopticon, which will penetrate thousands of private businesses *and homes* throughout the state. To call this prospect of perpetual government-mandated surveillance "Orwellian" is an understatement.

Enacted as Penal Code section 26806, the law conscripts every licensed firearm dealer in California, regardless of location, size, or volume of business, into an uncompensated surveillance arm of the State. Dealers must install, operate, and maintain a continuous audiovisual surveillance system. These systems must capture high-resolution video and audio of not only every firearm transaction but every person who enters or exits the premises, every interaction at the counter, and every area where firearms are displayed. The recordings must be preserved for at least one year and made available to the State on demand, without probable cause or judicial oversight. This system does not discriminate between legitimate and illegitimate activity. It captures the political organizer hosting an advocacy event after hours, the parent shopping with their teenager for their first hunting rifle, the gun buyer asking about compliance with California's firearms laws,[1] and the couple browsing sporting gear. All are recorded and archived.

What's more, for dealers who operate from their private residences, the cameras must be installed *inside their homes*. But the State's invasion into the home did not seem to concern the district court. To the contrary, the court faulted Appellants for "choos[ing] to sell firearms in a location where they may engage in other protected activities." Thus, rather than being "first among equals," Appellants' homes are now

---

[1] California laws regulating how firearms dealers must interact with their customers, including providing consumer safety information related to safe handling and safe storage, are set forth in Penal Code sections 26700-27140.

little more than the sets of a perverse film—one in which they are the stars, but the director never shouts, "Cut!" In California's newly surveilled homes, prayers are overhead. Children are recorded. Arguments are preserved. All of life's most intimate moments are laid bare for State inspectors to examine as they please. In its haste to dismiss Appellants' action, the district court subordinated the Constitution to amorphous notions of "public safety."

Section 26806 is not a mere regulatory compliance measure or a passive recordkeeping requirement. Nor is it a limited inspection mandate (or adequate substitute for a warrant) of the kind the Supreme Court has upheld in the context of "closely regulated" business. No, it is something else entirely. It is a full-scale government surveillance apparatus, operated by coerced private citizens, targeting a politically disfavored group engaged in the lawful exercise of their constitutional rights. The constitutional violations are manifold and severe. At minimum, Section 26806 violates the First, Fourth, and Fifth Amendments to the Constitution. Each violation is sufficient independently to warrant reversal of the district court's Rule 12(b)(6) dismissal. Together, they reveal a sweeping and dangerous expansion of state power that this Court cannot allow to stand.

First, the law imposes an unconstitutional search within the meaning of the Fourth Amendment. It requires dealers to continuously collect and store audiovisual recordings of the images and conversations of every person who enters their premises. This collection is not limited to regulatory inspections or recordkeeping. It is a suspicionless, indiscriminate search, functionally indistinguishable from placing a government officer inside every gun store, equipped with a body camera and with no constraints. Under the Supreme Court's precedents, such pervasive, automated data

collection—especially when carried out by or at the direction of the government—constitutes a search at the moment of collection. That it is funded and executed by a coerced private party does not remove it from the Fourth Amendment's ambit.

Second, Section 26806 effects an uncompensated physical and regulatory taking of private property in violation of the Fifth Amendment. The Supreme Court has recognized that a taking may occur when property owners are forced to accommodate state-imposed equipment or operations on their premises. The challenged law compels private business owners to surrender the use of their property, invest in costly surveillance infrastructure, and operate that infrastructure for the State's exclusive benefit. The financial and operational burdens are substantial, and the statute authorizes this dubiously constitutional public use of private property with no offsetting compensation.

Third, the First Amendment does not tolerate government action that chills speech, deters political association, or strips individuals of the right to speak anonymously. Yet Section 26806 does all of this. It requires firearm dealers to record all in-store conversations and retain those recordings for the State. Gun shops often serve as political gathering spaces for Second Amendment advocates, where members of civil rights organizations like Appellant California Rifle & Pistol Association and others meet and express their views. Firearm dealers and advocacy groups alike have curtailed in-store recruitment efforts, reduced or eliminated their participation in public events in gun shops, and limited their expressive activities. These harms are not hypothetical or speculative; they are specific and credible instances of chilled speech, supported by the allegations of the complaint.

The district court dismissed all these claims at the pleading stage, failing to credit the specific and credible allegations of harm presented in the complaint. It incorrectly applied the "closely regulated industry" exception to justify a sweeping surveillance regime that goes far beyond any regulatory inspection. And it declined to engage meaningfully with the controlling authorities of the Supreme Court and this Circuit. And its mechanical reliance on regulatory exceptions designed for transactional inspections, not perpetual surveillance, was plain error.

This Court should reverse and make clear that constitutional rights do not end at the threshold of a gun store or the doorstep of a home-based retailer.

## ARGUMENT

### I.    STANDARD OF REVIEW

This Court reviews the district court's dismissal under Federal Rule of Civil Procedure 12(b)(6) de novo. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1102 (9th Cir. 2003). The Court must accept all well-pleaded factual allegations in the complaint as true, construing them in the light most favorable to the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This "plausibility standard is not akin to a 'probability requirement,'" though it does "ask[] for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Bell*, 550 U.S. at 557)).

## II. SECTION 26806 VIOLATES THE FOURTH AMENDMENT RIGHT TO BE FREE FROM UNREASONABLE SEARCHES

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Section 26806 mandates that firearm dealers—including those who operate from their homes—install and maintain continuous, 24/7 audiovisual surveillance of interior spaces, including all points of sale, firearm display areas, and entrances and exits. This is a search under multiple constitutional frameworks.

First, it amounts to a trespassory intrusion on private property: the State forces citizens to install surveillance equipment that continuously records images and conversations inside constitutionally protected spaces, for the government's exclusive benefit.[2] The State did not contest this point below, and the district court bypassed it entirely—skipping straight to whether *use* of the footage was lawful, while ignoring the threshold question: whether the state-compelled *creation* of those recordings is itself a Fourth Amendment "search" that requires a warrant. It is.

Second, Section 26806 also violates the Fourth Amendment by intruding on activities inside the home—where individuals harbor a reasonable expectation of privacy. For "kitchen-table FFLs," the statute mandates constant surveillance inside private residences, capturing not just firearm transactions but also private conversations, family life, and visits from individuals uninvolved in any regulated activity. That level of intrusion is not justified by the presence of a business license. The court overlooked this core privacy interest and failed to meaningfully apply Fourth Amendment protections to the realities of compelled, *in-home* surveillance.

---

[2] *See* Orin S. Kerr, *The Two Tests of Search Law: What Is the Jones Test, and What Does That Say About Katz?*, Wash. Univ. L. Rev. (forthcoming 2025), *available at* https://ssrn.com/abstract=5129549.

13

The district court dealt with the Fourth Amendment issues only superficially, focusing on whether Section 26806 is an administrative search under the "closely regulated industry" exception under *New York v. Burger*, 482 U.S. 691 (1987), and whether it implicates a "reasonable expectation of privacy" under *Katz v. United States*, 389 U.S. 347 (1967). It failed to address Appellants' central arguments: that an illegal "search" is effected at the moment of the compelled recording, not only when the footage is later accessed or seized by the State (though the later seizure may also be problematic). And once that unlawful search occurs, it is irrelevant how many procedural safeguards the statute later provides (and Section 26806 provides none) for retrieving or inspecting the footage. The constitutional injury has already taken place.

By reducing its analysis to whether Section 26806 falls under the "closely regulated industry" exception or whether it violates a "reasonable expectation of privacy," the district court committed error and cut its Fourth Amendment analysis short. That was error. The decision should be reversed.

## A.     The Search Occurs at the Moment of Compelled Recording

The district court misunderstood the nature of the search that Section 26806 effects. Its fatal flaw was in failing to recognize *when* the search occurs, triggering Fourth Amendment scrutiny. The violation is not confined to the government's later seizure or review of the footage. It occurs at the moment the data is collected—that is, when it is recorded and stored by mandate of the State. This principle is firmly grounded in the Supreme Court's decisions in *United States v. Jones*, 565 U.S. 400, 402, 404 (2012) and *Carpenter v. United States*, 585 U.S. 296, 320 (2018), both of which recognize that the continuous collection of personal information by or at the direction

14

of the government is itself a search, no matter when the government physically seizes the data.

In *Jones*, the Court held that affixing a GPS device to a car and monitoring the vehicle's movements over 28 days was a Fourth Amendment "search." 565 U.S. at 402. The Court emphasized that the government's physical intrusion into private property to obtain information was exactly the sort of trespass that "would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted." *Id.* at 404-05.

*Carpenter* extended this protection to non-physical intrusions. 585 U.S. at 320. There, the Court reasoned that the government's passive collection of cell-site location information, even when done by a third party and without a physical trespass into private property, still constituted a search. *Id.* at 309-10. What mattered was the "inescapable and automatic nature," *id.* at 320, of the surveillance, not who was responsible for conducting it, *id.* at 309-10. The Court also made clear that it was not the government's later use of the information that triggered Fourth Amendment scrutiny—but the collection itself, which was deemed a search regardless of when or whether the data was viewed. *Id.* at 311-12.

Section 26806 implicates both *Jones* and *Carpenter*. First, the law commandeers firearm businesses to install and maintain surveillance systems inside their businesses and, in the case of home-based FFLs, inside their homes, for the express purpose of collecting information about everyone who enters, speaks, or interacts on the premises. This is a state-directed *physical intrusion* for the purpose of gathering information, and thus a trespassory search under *Jones*.

15

Second, the law mandates constant audiovisual recording on a continuous basis for all hours of every day. Cal. Penal Code § 26806(a). These recordings capture conversations, purchases, facial images, locations, and associations—exactly the kind of "deeply revealing" information protected under *Carpenter*. 585 U.S. at 320. That the surveillance is carried out by a firearm dealer, not a sworn officer, is immaterial. *Carpenter* made clear: "[T]he fact that such information is gathered by a third party does not make it any less deserving of Fourth Amendment protection." *Id.*

Section 26806 does not merely *permit* private surveillance for public purposes. It *mandates* it. Firearm dealers are no longer acting as private actors but are conscripted into the role of state agents. Under this Court's precedents, a private party becomes a state actor when there is (1) joint action, (2) a symbiotic relationship, or (3) delegation of a public function. *Brunette v. Humane Soc'y of Ventura Cnty.*, 294 F.3d 1205, 1210-14 (9th Cir. 2002). Section 26806 satisfies all three tests. It requires dealers to conduct surveillance at the government's direction (joint action) for the government's exclusive benefit (symbiosis), and to perform investigatory surveillance, which is a core function of law enforcement (public function). This is not a case of voluntary cooperation with law enforcement (*cf. United States v. Attson*, 900 F.2d 1427, 1433 (9th Cir. 1990)); it is statutory conscription into a mass government surveillance program.

This compulsion also triggers the doctrine of unconstitutional conditions. The government may not force a person to surrender one constitutional right to exercise another. *Simmons v. United States*, 390 U.S. 377, 394 (1968) (holding that a defendant cannot be compelled to waive Fifth Amendment rights to invoke Fourth Amendment rights). Yet California has imposed exactly that choice. Anyone who seeks to exercise their Second Amendment right to acquire a firearm must, as a condition, waive their

16

Fourth Amendment right to be free from warrantless surveillance while acquiring those arms. The same is true if one wishes to exercise their First Amendment rights to speak and assemble at gun stores. Indeed, even if a firearm transaction never occurs (e.g., tire kicking or purchasing an unregulated product like a flashlight), surveillance persists. As Justice Sotomayor recently reiterated, "[w]e find it intolerable that one constitutional right should have to be surrendered in order to assert another." *Kaur v. Maryland*, 141 S. Ct. 5, 6 (2020) (Kagan, J., concurring in denial of certiorari).

Even the statute implicitly concedes that the data collected is constitutionally sensitive. Section 26806(b) forbids the conscripted licensee to "use, share, allow access, or otherwise release recordings" except: (1) to a government agent conducting an inspection of the licensee's premises to ensure compliance with the law, but "*only if a warrant or court order would not generally be required for that access*"; or (2) "*pursuant to search warrant* or other court order"; or (3) in response to an insurance claim or as part of a civil discovery process. Cal. Penal Code § 26806(b) (emphases added).

In short, California's statutory requirement that dealers continuously record and preserve surveillance footage on its behalf is functionally equivalent to stationing a police officer—24 hours a day, 7 days a week—inside every gun store in California, capturing every conversation, image, and gesture of every person who enters the store. But unlike a police officer, Section 26806's surveillance never tires, and it has a perfect memory—both photographic and auditory. No court would authorize such a warrant, in perpetuity, for every customer, in every location, without probable cause. Yet that is what Section 26806 mandates. This is not routine regulatory oversight—it is a mass government surveillance program, imposed without cause, judicial oversight, or limit. Such is incompatible with the core protections of the Fourth Amendment.

17

## B.    The "Closely Regulated Industry" Exception Does Not Justify Constant Mass Surveillance

To dismiss Appellants' Fourth Amendment claims, the district court invoked the "closely regulated industry" exception from *Burger*. To be sure, FFLs have been held to be among those few businesses subject to this exception. *City of Los Angeles v. Patel*, 576 U.S. 409, 424 (2015).[3] But the court wrongly applied the doctrine to only the management and retrieval of the audiovisual records (*the seizure*), not their state-mandated creation (*the search*), where the constitutional violation occurs. Simply put, the *Burger* exception cannot be stretched to justify a permanent, suspicionless surveillance regime that captures all activity inside firearm dealers' premises, including private homes.

Under *Burger* and *Patel*, warrantless inspections are reasonable only in narrow circumstances, where three conditions are met: (1) the government has a substantial interest in the regulatory scheme, (2) warrantless inspections are "necessary" to further the regulatory scheme, and (3) the statute provides a constitutionally adequate substitute for a warrant. *Burger*, 482 U.S. at 402-03; *Patel*, 576 U.S. at 426. The

---

[3] Appellants disputed the continuing validity of this "exception" after *Jones*, *Jardines*, and the Supreme Court's recent Second Amendment precedents, and they continue to do so here. *See* Memorandum of Points & Authorities in Support of Plaintiffs' Application for Temporary Restraining Order at 12, *Richards v. Newsom*, No. 2024 WL 1600659(C.D. Cal. Mar. 1, 2024) (No. 23-cv-02413), ECF No. 11-1. Indeed, when applied to dealers in constitutionally protected products, it would seem that the right to Fourth Amendment property and privacy rights is at its zenith.

The "highly regulated industry" exception is premised on the notion that "[c]ertain industries have such a history of government oversight that no reasonable expectation of privacy could exist for a proprietor over the stock of such an enterprise." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978). But as the Supreme Court acknowledged in *United States v. Biswell*, 406 U.S. 311, 315 (1972), "[f]ederal regulation of the interstate traffic in firearms is not as deeply rooted in history as is governmental control of the liquor industry." Thus, after *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), which focused constitutional analysis on early, Founding-era historical tradition, Appellants have no reason to believe that the pervasive regulation of firearm dealers is even constitutional.

authorizing statute must also be "'carefully limited in time, place, and scope.'" *Burger*, 482 U.S. at 703 (quoting *Biswell,* 406 U.S. at 315). Section 26806 fails every prong of the test.

### 1. Section 26806 mandates mass investigatory surveillance, not traditional regulatory inspection.

To begin, Section 26806 is not the kind of limited, targeted inspection that *Burger* was meant to accommodate. In *Burger*, the Supreme Court upheld a New York statute authorizing brief, physical inspections of automobile junkyards during business hours to verify Vehicle Identification Numbers (VINs). 482 U.S. at 694-95, 711. The law did not involve surveillance, recording, or collection of expressive conduct. Nor did it authorize inspection outside normal business hours or in private residences. *Id.* at 711. On the contrary, the statute was limited as to both scope and time, authorizing officers to inspect only physical records, vehicles, and parts and "only 'during [the] regular and usual business hours.'" *Id.* The statute's scope was strictly confined to a narrow regulatory goal—verifying inventory—and executed through on-site inspections of a particular data set, not continuous, pervasive data collection. *Id.*

Section 26806 goes far beyond this sort of routine inspection, conducted merely for regulatory compliance or the periodic scrutiny of recordkeeping already required by law. Rather, it mandates continuous audio and visual recording, not only of regulated firearm transactions, but of every person who walks into a licensed dealer's premises—regardless of whether they buy a firearm, browse merchandise, or just speak with an employee about pro-gun literature made available by Appellant organizations. *See* 4-ER-611-12, 616-17. It operates not during periodic compliance visits, but 24/7, without end. It compels dealers to record and store this footage for a full year, making it available to government agents upon demand. And because the

19

statute applies not just to storefronts, but to home-based FFLs, it subjects private residences to this invasive surveillance regime—even outside of business hours. That is not a mere regulatory inspection; it is a technological dragnet, sweeping in expressive and associational conduct with no limiting principle.

### 2.    *Section 26806 fails all three prongs of the* **Burger** *test.*

First, the State has no interest, "substantial" or otherwise, in conducting indiscriminate surveillance of gun stores and the people who frequent them. Even assuming the State's general interest in deterrence of firearm-related crime is "substantial," the regulation must be tied to a concrete regulatory objective. Generalized deterrence does not justify indiscriminate surveillance. Section 26806 captures vast amounts of activity that bear no relationship to unlawful gun sales, including innocent conversations, advocacy meetings, non-firearm transactions, and even private conduct (including religious, medical, and sexual activities) within the home. A system that collects far more than the government needs is not a permissible "inspection"—it is an unconstitutional general search bordering on the writs of assistance that inspired the Fourth Amendment in the first place.

Second, the State has not shown that constant, warrantless audiovisual recording is "necessary" to further its regulatory interests. *Burger*, 482 U.S. at 702. And it cannot. Nothing in Section 26806 is tailored to known compliance risks. The statute imposes no limits on time or content. Surveillance is not confined to points of sale or restricted to business hours. Instead, the law demands round-the-clock monitoring of all people and all activities within the premises, including family members and non-customers. And customers are already subject to a thorough regulatory scheme, including background checks, waiting periods, registration, and the execution of sales

records under penalty of perjury. Appellants do not challenge those requirements here. But Section 26806 goes further—it forces dealers to record and store audiovisual data about every person who enters the premises, regardless of why they are there. That includes advocacy groups, small children, family members, and passersby. The State has not explained why constant surveillance of non-transactional behavior is needed to trace firearms or verify legal sales.

Finally, to satisfy the third *Burger* prong, the authorizing statute must serve as a constitutionally adequate substitute for a warrant. 482 U.S. at 703. In other words, "it must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers. *Id.* (quoting *Marshall*, 436 U.S. at 323). Section 26806 provides no such substitute. Firearm retailers must install the cameras, record continuously, store footage for a year, and make it available for government inspection without notice. Cal. Penal Code § 26806(a), (b)(1). The statute imposes no procedural limits on when or how government officials may demand to see footage during an "inspection," and no neutral magistrate stands between the State and the data.

While subsection (b)(2) requires a warrant for access to the recordings if that access is unrelated to the compliance inspections described in subsection (b)(1), that limited safeguard arrives too late. By the time the government views the footage, the search has already occurred. *Carpenter*, 585 U.S. at 320. What the trial court missed is that, under *Carpenter*, a warrant (or in this case, a statutory substitute for a warrant) is required to collect the audiovisual data *in the first place*. In other words, Section 26806

must still qualify as an adequate substitute for a warrant for conducting the "permeating" surveillance to comply with the Fourth Amendment. *Id.* at 305.

In short, Section 26806 cannot be sustained under the *Burger* framework. It is not a limited inspection program. It is a sweeping surveillance mandate that collects far more data than the government might even arguably need through means that are neither necessary nor constitutionally constrained. The Fourth Amendment requires more than a general interest in compliance and deterrence. It requires particularity, necessity, and oversight. Section 26806 has none of those features. The district court misapplied Burger. The challenged statute is at least *plausibly* unconstitutional at this stage of litigation.

### C.   The Overbreadth of Section 26806 Is an Especially Serious Violation of the Fourth Amendment Rights of Home-based FFLs

California argued below that Appellants' Fourth Amendment claim "fails as a matter of law" because *all* gun dealers operate in a "closely regulated industry subject to extensive federal, state, and local regulations and licensing schemes, and in which there is a diminished expectation of privacy." Defendants' Notice of Motion & Motion to Dismiss Amended Complaint ("Defendants' MTD") at 8, *Richards v. Newsom*, 2024 WL 4812537 (C.D. Cal. Oct. 16, 2024) (No. 23-cv-02413), ECF No. 41. According to the State, "in-home dealers are no exception." *Id.* The district court adopted the State's view wholesale. 1-ER-17-18. But neither California nor the court made any effort to reconcile this position with the Supreme Court's clear guidance that the home is entitled to special constitutional protection:

> [W]hen it comes to the Fourth Amendment, the home is
> first among equals. At the Amendment's "very core"
> stands "the right of a man to retreat into his own home
> and there be free from unreasonable governmental
> intrusion." This right would be of little practical value if

> the State's agents could stand in a home's porch or side
> garden and trawl for evidence with impunity; the right to
> retreat would be significantly diminished if the police
> could enter a man's property to observe his repose from
> just outside the front window.

*Florida v. Jardines*, 569 U.S. 1, 6 (2013) (citation omitted). That right is just as
diminished—perhaps more so—when the government compels a citizen to digitally
surveil himself 24/7, in his own home, for the government's later use. A regulation
that forces a gun dealer to install always-on recording equipment inside his private
residence, capturing family life and private conversations around the clock, reaches far
beyond anything the "closely regulated industry" exception permits. It also far exceeds
any diminished privacy interest in the firearm transactions themselves. *Compare Doe v.
Bonta*, 101 F.4th 633, 639 (9th Cir. 2024) (holding that firearm customers have no
reasonable expectation of privacy in firearm transaction information stored in state-
owned databases).

    Additionally, while courts have held that statutes may authorize warrantless
administrative searches, these searches remain susceptible to overbreadth challenges if
they sweep too broadly. *See Rush v. Obledo*, 756 F.2d 713, 719 (9th Cir. 1985). In
striking down a California statute authorizing warrantless inspections of home-based
daycares, this Court held that the law was impermissibly overbroad, "permitting
general searches of any home providing care and supervision at any time of the day or
night." *Id.* at 721. As this Court explained, the home-based daycare "is a business *only*
when children cared for from other families for compensation are present and *at all
other times is a private residence*." *Id.* (emphasis added). Without strict temporal and scope-
based limitations, the statute violated the Fourth Amendment.

    Section 26806 is far more intrusive than the law invalidated in *Rush*. It
authorizes not just periodic inspections, but perpetual surveillance—recording every

23

person, every sound, and every image inside a private home at all hours, whether or not any firearm-related business is being conducted. It subjects home-based dealers to searches "at any time of the day or night"—in fact, at all times—because surveillance must be continuous and uninterrupted. *Id.* Under *Katz* and *Rush*, such unbounded and continuous surveillance of the home is constitutionally intolerable. Even in a closely regulated industry, the Fourth Amendment protects the sanctity of the home. California's position—that the home-based dealer is "no exception"—is wrong as a matter of law. And the district court's failure to meaningfully engage with this fundamental distinction requires reversal.

## III. Section 26806 Effects an Uncompensated Taking Under the Fifth Amendment

The Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. That protection applies equally to the states. *Chicago, B. & Q. R.R. Co. v. City of Chicago*, 166 U.S. 226, 239 (1897). And the Supreme Court has made clear that a "permanent physical occupation"—even a minimal one—constitutes a per se taking. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982). This rule holds whether the property is real or personal. *Horne v. Dep't of Agric.*, 576 U.S. 350, 358 (2015) ("The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home.").

Section 26806 mandates exactly such a taking. It requires firearm dealers— including those operating from their homes—to install, maintain, and operate continuous surveillance systems on their private property. These systems must meet government specifications and serve the State's investigatory interests exclusively. Dealers are barred from using the footage for their own purposes and must bear the

24

substantial costs of compliance. This constitutes both a per se physical taking and a regulatory taking for which compensation is constitutionally required.

### A.     Section 26806 Constitutes a Per Se Physical Taking

The district court dismissed Appellants' per se takings claim on two flawed premises: (1) an unduly narrow reading of Appellants' allegations (citing only their admissions that gun stores have been classified as a regulated industry); and (2) an overbroad reading of the relevant case law, including a boot-strapped exception to common law rules defining trespassory intrusions to real property interests for "regulated businesses." *See* 1-ER-24-26.

Appellants allege that Section 26806 imposes a compelled physical installation of expensive surveillance infrastructure on private property without compensation. 2-ER-285-88, 313. The statute requires dealers to pay for the permanent installation of the physical recording system in their private buildings and dwellings, to replace or repair recording media that might wear out or malfunction, and to pay for electricity (and probably a battery backup) and an internet connection to operate the equipment—all according to the government's specifications. What's more, the law allows the government to access, view, and use the recordings at will, and Appellants are barred from using or accessing the footage they themselves paid to create. Cal. Penal Code § 26806(b). The system exists solely for state investigation and enforcement. *Id.*

This is not an occasional access regime; it is the very sort of permanent physical occupation that the Supreme Court has held constitutes a taking. Indeed, it squarely fits within the framework articulated in *Loretto* and reaffirmed in *Cedar Point Nursery v.*

25

*Hassid*, 594 U.S. 139 (2021). In *Loretto*, the Court found a taking where cable equipment was affixed to a residential building because there was a "permanent physical occupation" by the government, even though the intrusion was small and served a regulatory purpose. 458 U.S. at 437 (recognizing that "once the fact of occupation is shown," the extent of the intrusion is a factor in determining *what* compensation is due, not *whether* compensation is due). And in *Cedar Point*, the Court reiterated that "a permanent physical occupation constitutes a per se taking regardless [of] whether it results in only a trivial economic loss." 594 U.S. at 151.

The district court's reliance on *California Housing Securities, Inc. v. United States*, 959 F.2d 955 (Fed. Cir. 1992), is misplaced. 1-ER-25. That case involved the government assuming physical possession over the office of an insolvent savings and loan association following a finding of regulatory noncompliance and appointment of a conservator. *Cal. Housing*, 959 F.2d at 956-57. In contrast, Section 26806 applies preemptively and universally, without any individualized finding of wrongdoing, and without affording affected property owners either due process or compensation. For *California Housing* to apply, a gun store would have to be under active investigation for multiple violations of California's retail gun laws before the State could insist on the physical installation of surveillance equipment as a condition of keeping their license to sell guns.[4]

---

[4] The district court also bootstrapped an entirely new (and constitutionally unsupported) rule that "property rights can be diminished in such [a] heavily regulated industry in light of historically rooted expectations." 1-ER-25 (citing *Cal. Housing*, 959 F.2d 955). Even if it were appropriate (it is not) to acknowledge some "historically rooted expectation" that gun store owners have lesser property rights than other business owners, the framework for that analysis is set forth in the Supreme Court's *Bruen* decision, not in a decades-old Federal Circuit opinion about banking regulations.

A more apt analogy lies in *Hendler v. United States*, 952 F.2d 1364 (Fed. Cir. 1991), where the government installed permanent concrete monitoring wells on private land and returned periodically to inspect them. The Federal Circuit held this was a per se taking under *Loretto* in light of "[t]he permanency of the wells and the quasi-permanent right of entry provided to the government workers who monitored and maintained them." *Boise Cascade Corp. v. United States*, 296 F.3d 1339 (discussing *Hendler*, 952 F.2d at 1376-77). The court recognized that recurring governmental access to equipment physically installed on private land, regardless of whether the owner retains some use of the property, triggers Fifth Amendment protection. *Hendler*, 952 F.2d at 1377-78.

The facts here are materially indistinguishable. Section 26806 mandates the permanent installation of equipment on private land and allows continued governmental access to that equipment and the data it produces. Like the monitoring wells in *Hendler*, the surveillance systems here are not passive fixtures; they are state-directed tools for regulatory enforcement, permanently embedded into private businesses and homes. But Section 26806's surveillance mandate is perhaps even worse because it effectively forces firearm dealers to pay for and build the information surveillance "wells" on their property themselves.

The district court attempted to distinguish this case from *Loretto* and *Hendler* by yet again waving its "closely regulated industry" finding like a talisman to immunize Section 26806 from all constitutional scrutiny. 1-ER-24-26. But a firearm dealer's

---

*See Bruen*, 597 U.S. 1 (regulation of conduct protected by the Second Amendment is subject to a history, text, and tradition analysis of regulations from the founding era).

status as a regulated business does not nullify all constitutional protection, and especially not from an uncompensated taking of private property. Indeed, *Cedar Point* reiterated the well-established principle that "government-authorized physical invasions—whether by plane, boat, cable, or beachcomber—are physical takings requiring just compensation." 594 U.S. at 152. That rule applies to agricultural land and gun stores alike. Appellants do not here contest the State's authority to inspect their inventory or enforce licensing conditions. But a law that requires the physical installation of 24/7 surveillance systems in service of the state at the owner's sole expense is not a mere regulation. It is a compelled occupation and a taking under established precedent. No authority supports the position that the State may compel a permanent physical intrusion and the associated ongoing costs, without any compensation, merely because it regulates the underlying business.

In short, "[t]he essential question is not … whether the government action at issue comes garbed as a regulation…. It is whether the government has physically taken property for itself or someone else—by whatever means—or has instead restricted a property owner's ability to use his own property." *Id.* at 149 (citing *Tahoe-Sierra Preserv. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 321-22 (2002)). Section 26806 absolutely does so; it thus effects a taking for which compensation is due. *See, e.g.*, 2-ER-248-49 (Appellant Richards explaining that Section 26806 impedes use of his home office as both a law practice and FFL dealer due to client confidentiality concerns).

28

### B. Section 26806 Also Effects a Regulatory Taking Under *Penn Central*

As detailed above, Section 26806 effects a per se physical taking by compelling the installation and maintenance of state-mandated surveillance systems on private property, including inside Appellants' homes. That alone suffices to establish a Fifth Amendment violation. As the Supreme Court has made clear, when a regulation authorizes a physical appropriation of property, the per se rule applies, and the multi-factor *Penn Central* analysis "has no place." *Cedar Point*, 594 U.S. at 149.

Still, the district court elected to apply the *Penn Central* framework, apparently invoking the dissenting rationale from *Cedar Point*. Even under that standard, however, Appellants have plausibly alleged a compensable taking. *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978), requires consideration of several factors, including: (1) the economic impact of the regulation; (2) the extent to which it interferes with reasonable investment-backed expectations; and (3) the character of the government action. *Id.* at 124. Each of these factors weighs in Appellants' favor.

First, even the district court acknowledged that Appellants plausibly alleged a substantial economic burden. 1-ER-26-27 (finding that the economic burden factor "tilts strongly in Plaintiffs' favor"). Section 26806 imposes mandatory infrastructure and compliance costs estimated to be at least $17,000 per dealer—a significant expenditure, especially for small and home-based businesses. 1-ER-27; 2-ER-300-05. Appellants not only must buy and install the surveillance systems, but also must bear ongoing costs for storage, maintenance, electricity, and connectivity, all for the government's exclusive benefit. This burden is not speculative. It is direct, calculable,

29

and immediate. Where a regulation imposes substantial and unrecoverable costs on a discrete group of regulated entities, it weighs heavily in favor of a taking.

Second, Appellants alleged that Section 26806 upends their settled expectations by imposing novel, costly, and intrusive obligations not historically required to operate as firearm dealers. For instance, Appellants claimed that "section 26806 upends the status quo entirely," abruptly mandating constant audiovisual recording and threatening to make continued operation economically infeasible or constitutionally intolerable. 2-ER-289. They also alleged that the costly regulatory burdens of section 26806 "will price countless small-scale gun dealers out of existence" and that "[t]hese *unprecedented costs* naturally interfere with [their] expectations as to the uses of their property and the profit (and indeed livelihood) potential of operating a gun store in California." 2-ER-290. As to home-based dealers, Appellants alleged that Section 26806 "amounts to a complete taking because no meaningful domestic use remains if occupants are to be surveilled within their own homes." 2-ER-290. To avoid such constant surveillance, they must move out of their homes or quit their businesses altogether. 2-ER-290. These allegations, coupled with the findings that Section 26806 imposes a cost of at least $17,000 in equipment purchases on each dealer (for equipment they can't even use for their own purposes) and read in the light most favorable to Appellants, plainly meet the threshold necessary to establish "interference with reasonable investment-backed exceptions" under *Penn Central.*

The district court noted that both parties below provided "little argument in the way of interference with reasonable investment-backed expectations." 1-ER-27. Then it broke the tie in favor of the State because firearm dealers "operate in a highly

regulated industry." 1-ER-27. But a regulation can still interfere with reasonable expectations even within a specially regulated field, particularly when it departs from past practice and imposes new forms of burden, as here. Whether investment-backed expectations are reasonable should not be determined simply by reference to abstract industry status but by actual, historical regulatory conditions. Nothing about Section 26806's costly mass surveillance requirements is supported by the historical regulation of firearm dealers or any industry, for that matter. Indeed, the sheer novelty and invasiveness of Section 26806 represent a profound departure from any baseline understanding of the preexisting regulatory environment for firearm dealers. That departure, standing alone, demonstrates interference with reasonable investment-backed expectations under *Penn Central.*

Finally, Section 26806 constitutes uniquely invasive government action that interferes with Appellants' property rights. It is not a routine business regulation. It appropriates private property for ongoing government use—specifically, the collection, storage, and future retrieval of audiovisual surveillance data. It effectively deputizes private citizens to construct and operate a surveillance apparatus on behalf of the State, without compensation or consent. This compelled surveillance goes far beyond traditional inspection regimes. It is not limited in time, scope, or access. It applies 24/7, regardless of whether any transaction occurs, and even extends into private homes.

Nor did the State show that such invasive surveillance is necessary to achieve any purported regulatory goal, especially in light of the robust compliance systems (including federal background checks and mandatory recordkeeping) *already* in place to

31

police firearm retail businesses. A program this sweeping and one-sided—imposing significant costs and operational burdens while denying property owners any reciprocal benefit—demonstrates the kind of governmental overreach that the Takings Clause exists to check.

****

In sum, Section 26806 compels the permanent physical occupation of private property and imposes significant, one-sided burdens that frustrate long-standing expectations about the use of that property. Whether analyzed under the per se rule or *Penn Central*, Section 26806 operates as an uncompensated taking in violation of the Fifth Amendment. This Court should reverse the pleadings-stage dismissal of Appellants' takings claim.

## IV. SECTION 26806 VIOLATES THE FIRST AMENDMENT RIGHTS TO FREE SPEECH AND ASSEMBLY

The First Amendment provides that "Congress shall make no law … abridging the freedom of speech … or the right of the people peaceably to assemble." Section 26806's perpetual audiovisual surveillance mandate infringes each of these protected rights. By compelling firearm dealers to conduct perpetual audiovisual surveillance of constitutionally protected activity and store that data for government use, the challenged law imposes a regime that chills expression, deters political association, and obstructs participation in public discourse, especially among those who dissent from California's views on gun rights.

In dismissing Appellants' First Amendment claim, the district court gravely misapplied this Court's precedents. Even so, the district court correctly held that Appellants had standing to assert their First Amendment claim because "the threat of

32

chilling speech and loss of membership is a specific and 'well-founded' threat of future harm to satisfy standing." 1-ER-9. Thus, if Appellants were "able to show an injury," then the district court believed causation and redressability logically would fall in line. 1-ER-9. But rather than accept the truth of Appellants' allegations that they, in fact, *have been injured* by California's novel mass-surveillance regime, the district court contorted First Amendment precedents to conclude that such surveillance simply has no effect on speech or association whatsoever. The district court erred by disregarding the objective and foreseeable chilling effects of Section 26806's surveillance mandate. It dismissed allegations of actual harm as speculative and rewrote the statute to avoid constitutional scrutiny. That approach contradicts binding precedent and undermines the First Amendment, with implications reaching far beyond the surveillance of gun dealers. The district court's decision must be reversed.

### A. The Pervasive Surveillance of a Constitutionally Protected Industry Objectively Chills the Freedoms of Speech and Association

The district court began its analysis by rejecting the notion that government-mandated installation of audiovisual surveillance equipment to record politically controversial activities—*even within homes*—has any chilling effect at all on First Amendment activity. 1-ER-9-12. In the district court's words, Appellants "failed to demonstrate an *objective* fear that [Section] 26806 will impermissibly interfere with or chill speech" because "a person of ordinary firmness" would not be deterred "from future First Amendment activities." 1-ER-9-10 (emphasis added). Not only does that holding flout this Court's precedents, but it also flunks the test of simple logic. Do people alter their behavior when they know they are being watched? The answer is an emphatic *yes*.

33

Judges across the country seem to agree with that simple proposition. As Justice Sotomayor once observed, "[a]wareness that the government may be watching chills associational and expressive freedoms. And the government's unrestrained power to assemble data that reveal private aspects of identity is susceptible to abuse." *Jones*, 565 U.S. at 416 (2012) (Sotomayor, J., concurring). This Court has agreed time and again, recognizing for instance that "covert surveillance of church services" "may chill speech." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 868 (9th Cir. 2016); *cf.* 2-ER-277 ("Plaintiffs who regularly pray in thanks before meals at the kitchen table may be captured because it is done at the same place he conducts firearms transfers."); 2-ER-278 ("Free exercise of religion in Californians' own homes doubtlessly will be chilled by such monitoring.").

Courts in other circuits are in accord. *See, e.g.*, *Minneapolis Branch of the NAACP v. City of Minneapolis*, 2024 U.S. Dist. LEXIS 81602, at *14-15 (D. Minn. Mar. 29, 2024) ("Defendants' electronic surveillance of the ULTC allegedly chilled the ULTC's speech.... The ULTC's reaction to the surveillance establishes the ULTC's subjective chilling, and the test is objective. But the ULTC's claim passes the objective test as well."). The California Supreme Court agrees, having once explained that "the presence in a university classroom of undercover officers taking notes to be preserved in police dossiers *must inevitably* inhibit the exercise of free speech both by professors and students." *White v. Davis*, 13 Cal.3d 757, 767 (1975) (emphasis added).

The district court's contrary conclusion suggests that none of the above judges—including Justice Sotomayor and Circuit Judges Wardlaw and Paez—would be "persons of ordinary firmness," 1-ER-9, and that their First Amendment concerns with governmental surveillance, therefore, are *objectively* unfounded. Surely, that is not

so. Nor does it follow from even the district court's citations of law. Indeed, the district court acknowledged that a "party need not allege express punishment to establish the chilling of speech," and that "a wide variety of conduct … impermissibly interferes with speech," including the prospect of being "recorded by watchful eyes and perhaps kept on government file." 1-ER-9-11. But the court ultimately failed to connect the dots that that is *precisely* what Section 26806 establishes.

### 1. Section 26806 chills protected speech.

Section 26806 requires firearm dealers—many of whom are also political advocates and members of advocacy organizations—to record all in-store conversations, including those that occur at events, meetings, or informal gatherings outside of business hours and unrelated to firearms sales. The statute also applies to home-based firearm dealers without limitation, meaning that its surveillance extends into private residences where politically charged conversations and other expressive conduct certainly occur. Appellants alleged as much. *See, e.g.*, 2-ER-248. 276-77. Compelled, round-the-clock surveillance of this nature "must inevitably" have a chilling effect on such constitutionally protected expression. Still, the district court offered four reasons to dismiss Appellants' claim that Section 26806 chills their protected speech. 1-ER-10-12. None is persuasive.

First, the district court summarized Appellants' allegations of the chilling effects of governmental surveillance on their freedom of speech, discounting these obvious statements as merely "speculative" and "conclusory." 1-ER-10. But the court's summary was incomplete. The operative complaint included detailed allegations that the surveillance mandate was *already* deterring Appellants and their members from attending, hosting, and speaking at firearm-related events. For

instance, Appellants alleged that Appellant Clark "*would continue* attending, informing, teaching, and participating in … gun shop events" but for the enforcement of Section 26806. 2-ER-249-50 (emphasis added). More to the point, he alleged that the knowledge of constant audiovisual surveillance "prevents [him] from freely communicating with FFLs as to ongoing legal and legislative initiatives for fear of being recorded by the government," and "chill[s] his ability to speak freely for fear of retribution by the government." 2-ER-249-50. These are not speculative harms—they are concrete instances of chilled speech having occurred. Rather than accept these allegations (and many more like them) as true, the district court pretended they had never been made, failing to explain how Appellants' allegations were insufficient.

Instead, the district court focused on Appellants' purportedly "subjective beliefs about California's 'war on the Second Amendment,'" claiming that Appellants cannot have "an objective belief that such targeting has or will occur." 1-ER-11. But the prospect of *retaliation*, whether speculative or not, is not the appropriate test. As the district court was forced to acknowledge, "[a] party need not allege express punishment to establish the chilling of speech." 1-ER-9. Indeed, this Court has thus recognized cases where "the government may chill speech" not just by "threatening or causing … harm" or by "prohibiting" conduct, but also by "intercepting" communications and even "conducting covert surveillance" of constitutionally protected conduct. *Ariz. Students' Ass'n*, 824 F.3d at 868. Indeed, "the government may chill speech by threatening or causing pecuniary harm, … withholding a license, right, or benefit, … prohibiting the solicitation of charitable donations, … detaining or intercepting mail, … or conducting covert surveillance of church services...." 1-ER-9 (collecting cases). If even *covert* surveillance can chill First Amendment expression,

so too must the *overt* surveillance of Section 26806. And in any case, the absence of "intentional[] target[ing]" by the government certainly has no bearing on whether a speaker *objectively* would be chilled by the fact of surveillance itself.

But even if Appellants' fear of retaliation from California authorities were entirely "subjective" as the district court claimed, courts have recognized "how [a] plaintiff acted might be evidence of what a reasonable person would have done." *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003). To that end, the question of what "a person of 'ordinary firmness'" would "have done in reaction" to allegedly chilling governmental conduct is the "sort of question … usually best left to the judgment of a jury, twelve ordinary people, than to that of a judge, one ordinary person." *Id.* As the Eighth Circuit once observed, "[t]he jury, after all, represents the conscience of the community. It decides many similar questions—for example, what would a person of ordinary prudence have done in certain circumstances?" *Id.* In contrast here, the district court imposed its *own* view of how ordinary people respond to pervasive audiovisual surveillance—on a *motion to dismiss*, no less.

In an apparent attempt to distinguish Appellants' allegations of chilled speech, the district court cited *Blout v. Rizzi*, 400 U.S. 410 (1971), which involved "the *actual interception* of mail," and *Presbyterian Church (USA) v. United States*, 870 F.2d 518 (9th Cir. 1989), which involved a "*direct threat* to members of the churches [sic] congregation that they would be *recorded by watchful eyes and perhaps kept on government file*," to claim that "there is no such objective allegation" in Appellants' complaint. 1-ER-11 (emphases added).

But that is *precisely* what Appellants suffer under Section 26806, and they already alleged as much. *See* 2-ER-267 ("conversations will now be recorded and accessible to

government investigators"), 2-ER-281 ("Section 26806 … permit[s] government agents to freely enter upon [Appellants'] property to perpetually access and view, at-will, that digital video surveillance). Indeed, California commandeers gun dealers to '*actually intercept*' all conversations taking place within their commercial properties or even *homes*, as the case may be, to be made available "to an agent of the department or a licensing authority" on demand. Cal. Penal Code § 26806(b)(1). If a government-mandated "digital video surveillance system" that "clearly record[s] … audio" and must "continuously record 24 hours per day," with data to "be maintained for a minimum of one year," does not constitute "watchful eyes" and "government file[s]," it is difficult to imagine what *would*. 1-ER-11.

Second, the district court posited that Appellants' "allegations of a chilling affect [sic] are objectively unfounded" because a "person of ordinary firmness … would not think" the government could access gun dealers' recordings "in light of § 26806(b)'s limitations on usage…." 1-ER-11. But the test is whether a "person of ordinary firmness" would be *chilled* knowing they are being surveilled at the government's behest—not whether such person would share a certain understanding of the precise operation of a statute.

Moreover, Section 26806 plainly is not limited in the way the district court claimed. By its plain terms, Section 26806 places *no restriction* at all on what information may be copied or seized by the government, and it establishes *no limit* whatsoever on the government's subsequent use of that information:

> (b) A licensee shall not use, share, allow access, or otherwise release recordings, to any person except as follows:
>
> (1) A licensee shall allow access to the system to an agent of the department or a licensing authority conducting an inspection of the licensee's premises, for the purpose of

38

> inspecting the system for compliance with this section, and only if a warrant or court order would not generally be required for that access.
>
> (2) A licensee shall allow access to the system or release recordings to any person pursuant to search warrant or other court order.
>
> (3) A licensee may allow access to the system or release recordings to any person in response to an insurance claim or as part of the civil discovery process, including, but not limited to, in response to subpoenas, request for production or inspection, or other court order.

Cal. Penal Code § 26806(b) (emphases added). In fact, subsection (b) places restrictions *only* on *gun dealers* (the licensees), not the *government*. The district court failed to engage with what Section 26806's text allows, and it recast the statute to avoid this glaring constitutional issue. *But see United States v. Lucero*, 989 F.3d 1088, 1094 (9th Cir. 2021) ("'[T]o ignore the plain text' of a statute is 'something we are not at liberty to d[o].' … '[O]ur task is to apply the text, not to improve upon it.'").

Indeed, Section 26806(b) expressly contemplates governmental access "for the purpose of inspecting the system for compliance with this section…." Government agents, therefore, must ensure that Appellants' surveillance systems "clearly record images" as well as "audio," and that such systems "continuously record 24 hours per day at a frame rate no less than 15 frames per second." Cal. Penal Code § 26806(a). How else would agents ensure Appellants' systems are recording images and audio, other than by *watching* and *listening* to the recordings? How would agents verify compliance with the 24-hour recording requirement, other than by viewing recordings to ensure they are being taken at 3:00 AM, or any other sample timestamp? And how would they ensure compliance with the framerate requirement? Clearly, Section 26806 contemplates governmental *scrutiny* of recordings, and it does not disallow agents from

39

"seiz[ing] and copy[ing] recordings" to fulfill the statute's objectives, as the district court believed. 1-ER-11.

To the contrary, Section 26806 only provides that "[a] *licensee* shall not use, share, allow access, or otherwise release recordings, to any person except," inter alia, government agents. Cal. Penal Code § 26806(b) (emphasis added). The statute therefore allows government agents to "use," "share," and "access" recordings, and to have such recordings "released " to them. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 96 (2012) ("[W]hen a text authorizes a certain act, it implicitly authorizes whatever is a necessary predicate of that act."). The statute does not contain any of the limitations on government agents that the district court pretended were there.

Third, the district court faulted Appellants for noting Appellees' admission that Section 26806 deters unlawful straw purchases of firearms and the verbal interactions that underlie such purchases. 1-ER-11-12. Claiming that the chilling of "unprotected, unlawful speech, such as a straw purchase, is not relevant to the inquiry," 1-ER-11, the district court missed the point that Section 26806 necessarily must chill at least *some* speech. And once again, the district court failed to engage with Appellants' allegations of all the protected speech that Section 26806 *does* in fact chill. *See, e.g.*, 2-ER-249-50 ("attending, informing, teaching, and participating in gun shows and gun shop events").

Fourth, the district court denied "that at-home FFLs would be subject to 24/7 speech surveillance inside their protected homes," despite acknowledging that Section 26806 "requires recording and audio" of multiple *interior locations* within homes. 1-ER-12. Instead, the district court maintained that Section 26806 "only requires recording

40

and audio in 'all entries or exits,' '[a]ll areas where firearms are displayed,' and '[a]ll points of sale.'" 1-ER-12 (quoting Cal. Penal Code § 26806). Thus, according to the district court, sound must not travel. But with respect to at-home FFLs, Section 26806 means that children's identities and interactions are captured right at the front door, as are those of all house guests. So too are conversations from the dining room, which float within earshot of California's Panopticon. And in the case of a "kitchen-table FFL," Section 26806's mandate means "24-hour surveillance of … a person's kitchen table," the "point of sale" for business activities that infrequently take place. 2-ER-276. At bottom, Section 26806 mandates constant audiovisual surveillance of the interiors of Appellants' homes, even when Appellants are not using their homes for business purposes. By claiming Section 26806 "only" covers certain interior locations, as if in isolation, the district court missed the forest for the trees.

Perhaps acknowledging the absurdity of that reasoning, the district court ultimately demurred that at-home FFLs "choos[e]" to engage in the business, and "[s]urveillance is merely another regulation that an at-home FFL should reasonably expect." 1-ER-12. But that was not the expectation of Appellants' existing FFL members when *they* entered into the business before Section 26806's enactment, without such pervasive surveillance already in place. Under the district court's logic, the government could require participants in a regulated industry to give up *all* First Amendment rights (and in fact all their constitutional rights), and "such is the sacrifice they choose to make dealing in the industry." 1-ER-12. The district court offered no limiting principle for its newfound "highly regulated industry" exception to the *First* Amendment. And under such logic, there is none.

41

## 2. *Section 26806 chills the freedom of assembly.*

The district court likewise rejected Appellants' freedom of assembly argument, despite acknowledging that "[d]isclosure requirements may be said to chill association, even if there is no disclosure to the general public." 1-ER-12. In so holding, the district court attacked its own strawman claim that "Section 26806 has no requirement that individuals, gun shops, or organizations such as GOA, GOC, CRPA, and SAF, submit a membership list to the government." 1-ER-13. Thus, according to the district court, the government simply cannot chill the freedom of assembly *unless it demands the submission of membership lists.* This reading elevates form over substance, limits *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958), to its facts, and ignores other authorities that have acknowledged the breadth of governmental conduct likely to chill free assembly.

Indeed, as the California Supreme Court has observed in the school context, even though "surveillance of university classrooms and organization[] meetings may not constitute a direct prohibition of … association, such surveillance may still run afoul of the constitutional guarantee if the effect of such activity is to chill constitutionally protected activity." *White*, 13 Cal.3d at 767. And, of course, the specter of governmental surveillance chills associational activity. *See, e.g.*, *id.* at 772 (explaining that "police surveillance activity" can have a "significant potential chilling effect," and so "surveillance activities can only be sustained if defendant can demonstrate a 'compelling' state interest which justifies the resultant deterrence of First Amendment rights and which cannot be served by alternative means less intrusive on fundamental rights"); *see also United Furniture Workers v. Gates*, 75 F. Supp. 620 (N.D. Ind. 1948) (invoking freedoms of expression and association to enjoin police from overtly surveilling union meetings). Contrary to the district court's

42

suggestion that California must demand membership lists before chilling free assembly à la *NAACP*, First Amendment freedoms "are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." *Healy v. James*, 408 U.S. 169, 183 (1972) (quoting *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960)).

Such is the case here. As Appellants explained, they introduce themselves to gun store patrons as organization members during recruitment efforts. For instance, "Mr. Clark talks to others about their rights, [and] the importance of membership in the CRPA...." 2-ER-249-50. Such disclosure of affiliation now must occur under the government's watchful eye if it is to occur as it previously had at all. But as Appellants explained, rather than appear on government-mandated records as members of Second Amendment advocacy organizations, they have discontinued such activity altogether. *See*, *e.g.*, 2-ER-249-5 (alleging that Appellant Clark "would continue attending, informing, teaching, and participating in … gun shop events" but for the enforcement of Section 26806). Appellants have plainly alleged that Section 26806 chills their freedom of assembly. There is nothing "threadbare" about that. 1-ER-14.

Next, the district court discounted Appellants' reliance on *Bates v. City of Little Rock*, 361 U.S. 516 (1960), once again on the theory that, unlike the ordinance in *Bates*, Section 26806 does not "require[] disclosure of the identities of individuals who belong to an organization or association," and in any case, Section 26806 authorizes government access only under "very limited circumstances." 1-ER-13-14. But again, Section 26806 *does* require membership disclosure when Appellants advertise themselves as members of organizations during recruitment efforts. *See* 2-ER-249-50. Now, if Appellants are to introduce themselves within gun stores, the government

43

records who they are. And as the Supreme Court already observed, the "forms of governmental action which might interfere with freedom of assembly" are "varied." *NAACP*, 357 U.S. at 462. Thus, not even *NAACP* stands for the district court's holding that, to violate the First Amendment, a state's action must "force[] disclosure of membership lists." 1-ER-13. Moreover, governmental access to Section 26806 recordings is not nearly as "limited" as the district court insists it is. 1-ER-14. As Appellants explained above, the statute's plain text provides otherwise, proscribing all manner of *gun dealer* conduct while remaining silent as to any similar proscriptions of *governmental* conduct.

Finally, the district court glossed over Appellants' reliance on *Shelton v. Tucker*, 364 U.S. 479, 480 (1960), which invalidated a requirement of self-disclosure of organizational membership "as a condition of employment." Section 26806 likewise requires Appellants' self-disclosure of organizational membership as a condition of continuing their recruitment efforts in gun stores—a core aspect of their associational activities. But the district court never drew this parallel. Nor did it acknowledge that Appellants' discontinuation of protected activities to avoid the disclosure of their identities is proof positive that their associational freedoms have been abridged. *See NAACP*, 357 U.S. 449.

Notably absent from the district court's free-assembly analysis was any rejection of the notion that Section 26806 chills people of ordinary firmness from freely associating. Indeed, the district court never mentioned the First Amendment's objective standard here. Instead, it summarily dismissed Appellants' free-assembly claim by purporting to require a literal disclosure of membership lists, before demurring that the statute somehow sets limits on governmental use that do not

44

appear on the statute's face. The district court erred in its analysis, and its grant of Appellees' motion to dismiss should be reversed.

### B. Section 26806 Violates the Longstanding Right to Anonymous Speech

The district court likewise rejected Appellants' anonymous-speech argument, relying entirely on the firearm industry's general degree of regulation to claim that individuals have no right to speak anonymously so long as firearms are involved.[5] *See* 1-ER-14-16. Indeed, the court took the callous position that, if Appellants choose to speak in a regulated industry, "such is their choice to make," even when the state mandates off-hours surveillance *in Appellants' homes*. 1-ER-15; *see also* 1-ER-16 ("If individuals seek anonymity to create robust debate, they would know to avoid visiting a public business in person that is highly regulated by the government."). But resort to this sort of self-approving value judgment should have been evidence enough that the court had long departed from applying a *plausibility* standard for a motion to dismiss. Indeed, just because an industry is regulated does not mean its participants enjoy *no* privacy. This Court already held as much. *See Rush*, 756 F.2d 713 (at-home daycare providers "retain[] expectations of privacy").

The district court discounted Appellants' reliance on *McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995), and *Doe v. 2TheMart.com Inc.*, 140 F. Supp. 2d 1088, 1092 (W.D. Wash. 2001), summarily concluding that discourse within gun stores does not further the "marketplace of ideas" *or* "robust debate." 1-ER-15-16. But as the Eighth Circuit once observed, "the First Amendment does not allow the courts … to

---

[5] Comparing the firearm industry to the "cannabis," "banking," and "gambling" industries, which already face surveillance requirements, the district court suggested that the firearm industry should be treated no differently. 1-ER-15. But unlike any of those industries, the firearm industry is not just politically controversial in California, but also expressly enumerated as a constitutional right.

45

decide whether a category of speech, on the whole, tends to contain socially worthless information." *281 Care Comm. v. Arneson*, 638 F.3d 621, 635 (8th Cir. 2011). Even with respect to commercial speech, "[t]he general rule is that the speaker and the audience, not the government, assess the value of the information presented." *United States v. United Foods*, 533 U.S. 405, 411 (2001).

Nor did *McIntyre* or *2TheMart.com* leave any room for the district court to assert its personal opinion on the value of Appellants' speech. To the contrary, "an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." *McIntyre*, 514 U.S. at 343. Thus,

> [t]he decision in favor of anonymity may be motivated by fear of … official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible. Whatever the motivation may be … the interest in having anonymous works enter the marketplace of ideas unquestionably outweighs any public interest in requiring disclosure as a condition of entry.

*Id.* at 341-42. The district court was in no position to second-guess this "great tradition that is woven into the fabric of this nation's history." *2TheMart.com*, 140 F. Supp. 2d at 1092. Indeed, the district court's approach was foreign to the standard for deciding minimal plausibility on a motion to dismiss.

### C. Section 26806 Is Hopelessly Overbroad

Last, the district court summarily dispensed with Appellants' First Amendment overbreadth argument, making the stunning claim that "Section 26806 is entirely devoid of any regulation of speech." 1-ER-17. But if that were true, then the district court's earlier finding that Appellants had *standing* to raise a First Amendment claim makes little sense. 1-ER-9 ("The Court agrees … that the threat of chilling speech and

46

loss of membership is a specific and 'well-founded' threat of future harm to satisfy standing."). And because the court exclusively relied on its paltry speech analyses to dismiss Appellants' overbreadth challenge, the district court's reasoning fails for the reasons already discussed.

In any case, Appellants alleged that "Section 26806 is unconstitutionally overbroad because, in an effort to 'catch a criminal,' the law seriously and deliberately burdens a vast amount of speech that does not constitute such a communication and is fully protected by the First Amendment." 2-ER-312. As the State argued below, the statute's ostensible purpose is to "assist[] law enforcement in combatting and deterring firearms trafficking, thefts, straw purchases, and other gun crimes," and to "provide[] key evidence in prosecuting" violators. Defendants' MTD at 1 & 2, *Richards*, 2024 WL 4812537 (No. 23-cv-02413), ECF No. 41. But in order to do so, what can Appellees possibly gain by recording families eating pancakes in their pajamas on Christmas morning?

Section 26806 is precisely the sort of sweeping, heavy-handed law that the First Amendment overbreadth doctrine was designed to invalidate. The Supreme Court "provided this expansive remedy out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003). To that end, "plaintiffs 'are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" *Green v. Miss USA,*

47

*LLC*, 52 F.4th 773, 800 (9th Cir. 2022) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)).

Not only have Appellants refrained from constitutionally protected conduct, but they also alleged how others will, too. Indeed, under Section 26806's surveillance of home-based FFLs, "[e]very dinner guest, handyman, child's playdate, or potentially the client of a spouse who works from home would have to give consent to be recorded." 2-ER-306. Even "[p]ersonal religious conversations between spouses, parents and children, and homeowners and houseguests will be subject to monitoring by the state." 2-ER-278. The district court engaged with none of these allegations, and it considered no other scenarios of its own. But as this Court made clear, "the overbreadth doctrine requires courts to assume and evaluate *purely hypothetical* fact patterns to vindicate First Amendment interests of parties not even before the court." *Green*, 52 F.4th at 800.

At this stage, the district court should have accepted Appellants' allegations as true. It failed to do so, and the ruling below should be reversed.

## CONCLUSION

The Constitution does not permit the State to conscript private citizens into building and funding a permanent Orwellian surveillance apparatus on their own property. As explained above, Section 26806 authorizes continuous, warrantless audiovisual monitoring of lawful business owners (and homeowners) and their customers in violation of the Fourth Amendment; imposes an uncompensated physical and regulatory taking in violation of the Fifth Amendment; and chills lawful expressive and associational activity in violation of the First Amendment. As one

48

federal court recently warned, "[t]he unregulated power of Government to regulate without constitutional protections gives the regulator undue power to destroy." *Tex. Ass'n of Money Servs. Bus. v. Bondi*, Case No. 25-cv-00344, slip. op. at 2 ( W.D. Tex. May 19, 2025), ECF No. 59. Section 26806 is precisely that kind of overreach.

This Court should reverse the district court's dismissal of Appellants' claims and remand for further proceedings.

Respectfully submitted,

Dated:  May 27, 2025

**MICHEL & ASSOCIATES, P.C.**

s/ Anna M. Barvir
Anna M. Barvir
*Attorneys for Plaintiffs-Appellants Adam Richards, Jeffrey Vandermeulen, Gerald Clark, Jesse Harris, On Target Indoor Shooting Range, LLC, Gaalswyk Enterprises, Inc. (D/B/A/ Smokin' Barrel Firearms), Gun Owners of California, Inc., Gun Owners of America, Inc., Gun Owners Foundation, and California Rifle & Pistol Association, Incorporated*

Dated:  May 27, 2025

**LAW OFFICES OF DONALD KILMER, APC**

s/ Donald Kilmer
Donald Kilmer
*Attorney for Plaintiff-Appellant Second Amendment Foundation*

49

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-693

I am the attorney or self-represented party.

**This brief contains** | 13,588 | **words,** including | 0 | words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [ ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Anna M. Barvir | **Date** | May 27, 2025
*(use "s/[typed name]" to sign electronically-filed documents)*

## CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2025, an electronic PDF of **APPELLANTS'**

**OPENING BRIEF** was uploaded to the Court's CM/ECF system, which will

automatically generate and send by electronic mail a Notice of Docket Activity to all

registered attorneys participating in the case. Such notice constitutes service on those

registered attorneys.


Dated: May 27, 2025                        Respectfully submitted,

                                           **MICHEL & ASSOCIATES, P.C.**

                                           s/ Anna M. Barvir
                                           Anna M. Barvir
                                           *Attorneys for Plaintiffs-Appellants*